EUGENE S. PIKE

v.

LEVI Z. LEITER ET AL.

*Landlord and Tenant—Ground Lease—Provision for Renewal—Compliance with—Use of Part of Premises for Street—Duty of Grantee of Lessor—Appraisement—Award of Umpire—New Lease—Tender and Acceptance—Parol Evidence.*

1. Upon a bill and cross-bill involving a ground lease of certain premises and a renewal thereof under the provisions of the original lease, it is *held*: That the grantee of the original lessor obtained no title to the part of the premises in question, of which the city had acquired title for use as part of

Pike v. Leiter.

a street; that the award made by the umpire appointed by the appraisers is valid, the appraisal to fix the rental for the new term not including the portion of the premises used as a part of the street; and that the new lease tendered by the owner was duly accepted and is a valid and subsisting lease.

2. The acceptance of an instrument is a matter of intention to be gathered from the acts and words of the person to whom it is offered.

3. In the absence of fraud, parol words, whether prior, contemporaneous, or subsequent, are inadmissible to alter or annul a sealed instrument.

[Opinion filed May 16, 1888.]

APPEAL from the Superior Court of Cook County; the Hon. GWYNN GARNETT, Judge, presiding.

In 1866, A. Nisbet Turnbull, being the owner in fee of certain parcels of land in the City of Chicago, by an indenture of lease demised to James H., George S. and Chauncey T. Bowen, five lots by the following description:

"Lots numbered one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3) and the north one quarter ($\frac{1}{4}$) of six (6), in block two (2), in fractional section fifteen (15), addition to Chicago, said premises being situated on the southeast corner of State and Madison Streets, and constituting a square piece of ground, with a frontage of 100 feet on State Street, and of 100 feet on Madison Street;" for a term, commencing on July 1, 1866, and ending July 1, 1885, at an annual rental of $3,200, payable in quarterly installments of $800 each.

The lessees agreed to erect, within a reasonable time, first class storehouses, to cover the entire front of said premises, and to keep said buildings insured in an amount not less than $20,000; the lessor, for himself, his heirs and assigns, covenanted with the lessees, their administrators, executors and assigns, to pay the value of the buildings, as follows: one-third cash at the expiration of the term, and the remainder in two annual installments, in one and two years, with interest at six per cent., such value to be ascertained as follows: That the lessor and the lessees should severally appoint one disinterested real estate owner in Chicago to value the buildings,

and if said two persons should differ in regard to the value, they should appoint a proper person to be umpire between them, and the decision of such two persons first named, or, in case of their disagreement, of such umpire, should be final and conclusive.

It was further provided in said lease that if said lessees, their administrators, executors or assigns, should, as early as two years before the expiration of the aforesaid term, signify to the lessor, his heirs or assigns, their desire to take a new lease of the land aforesaid, for a term of twenty years next after the expiration of the term first granted, at an annual rental equal to six per cent. upon the value of said land at the end of said term, the said lessor, his heirs or assigns, instead of paying for said buildings at the end of said first term, should and would make and execute to said lessees, their heirs or assigns, a new lease of said premises for a term of twenty years next after the expiration of the said first term, at an annual rental equal to six per cent. of the value of the land (exclusive of the buildings) at the end of said first term. Such new lease to contain all the covenants contained in said first lease except the covenants for the renewal of the lease and for the purchase of the buildings, and also to contain a covenant that at the expiration of the term named in said new lease, said lessor, his heirs or assigns, would pay to said lessees, their executors, administrators or assigns, such a sum of money, cash in hand, as the buildings then on said premises should be fairly worth for building materials; that for the purpose of such new lease the value of said land, at the expiration of said first term, should be fixed and determined conclusively, by appraisal of persons of the character aforesaid, to be appointed in the manner aforesaid, at least one month before the expiration of said first term; that the annual rental under said new lease should be a sum equal to six per cent. of the value so determined. The lessees further agreed to pay all water rates, taxes and assessments.

The lease also provided that if any installment of rent should remain unpaid for thirty days, the lessor might sell at auction, to the highest bidder, all the buildings and improve-

Pike v. Leiter.

ments on said premises, and all the right, title and interest of the lessees in the demised premises, which sale should be a perpetual bar to the rights of the lessees.

The lease contained no provision prohibiting an assignment thereof, nor requiring the assent of the lessor to any assignment. After the making of this lease and on October 2, 1866, A. N. Turnbull conveyed the leased lots, with others, to Henry C. Turnbull, trustee.

About 1868 a project was started to widen State Street from Madison to Jackson Street, to a width of 100 feet, by taking twenty-seven feet off the west end of the lots on the east side of State Street; and by an agreement between the trustee and the lessees, the erection of permanent improvements on the demised lots was postponed until the proceeding to widen State Street should be completed or the project abandoned.

The city prosecuted its proceedings for widening, so that in 1870 net damages to the reversion of the five lots for the twenty-seven feet taken off from the west end thereof, were awarded, aggregating $26,802.80, and to the leasehold the sum of $700.

These damages were not paid by the city, and to prevent the city from taking possession of the twenty-seven feet before paying, a fence was kept up by the tenants at the request of the landlord's agent, till in the year 1873, when the city was allowed to remove the fence, and improve the land taken from the street under an agreement with the owner that such action should not change the legal status or prejudice the rights of ownership. The tenants had, prior to the removal of the fence, built on the lots on the new line of State Street.

Of the assessment made by the city for benefits on property not injured or diminished by the improvement, something more than one half the aggregate was collected, but the amount awarded to the tenants or to the owners of the reversion of the lots in question was not tendered to be paid, and no notice that sufficient money for that purpose was in the hands of the city treasurer was ever given in the corporation newspaper, as required by Sec. 16, Chap. 7 of the city charter,

under which the proceeding was had, but the city improved the twenty-seven feet as part of the street, and continued to use it as such.

In July, 1876, Turnbull brought suit against the city in the United States Circuit Court for the Northern District of Illinois to recover damages awarded to the reversion, and in May, 1877, he recovered a judgment for the amount of such damages, and for the interest thereon from the time the city had taken possession of the land. This judgment was entered after trial and pending a motion for new trial by stipulations between Turnbull and the city, by which it was agreed that Turnbull should execute a conveyance of the twenty-seven feet to the city which should be delivered to the corporation counsel to be held in escrow until the city paid the judgment. The conveyance was executed and contained a clause reciting that the premises conveyed were "to be used as a part of State Street, this conveyance being made for the sole purpose of ratifying and confirming certain condemnation proceedings heretofore instituted by said City of Chicago under which possession of said premises has been taken by said City of Chicago. This deed is in no way to affect the rights of any lessees of the premises, but is intended to leave the rights of all parties the same as though said city held said premises solely under said condemnation proceedings."

After the damages for taking the land had been fixed in the condemnation proceeding, the tenants claimed that they should be allowed a rebate from the rent, but after some discussion the matter was passed, and the tenants continued to pay the full rent reserved in the lease as it became due, but under protest and claim that a rebate should be allowed.

On April 10, 1878, Turnbull, the trustee, sold and conveyed to Levi Z. Leiter the lots described in the lease to the Bowens (with other lots), "subject, however, to such rights as the said City of Chicago might have acquired to the west twenty-seven feet of said lots as a part of State Street, by deed, condemnation proceedings, judgment or otherwise."

Turnbull, by an agreement of the same date, for a consideration of $35,000, assigned to Leiter the judgment against

the city in the United States Court. About June 25, 1879, the city paid to Leiter the amount of the judgment in the United States Court, and the conveyance from Turnbull to the city for the twenty-seven feet was then placed on record.

By means of various mesne conveyances the Bowen lease became the property of appellant, Eugene S. Pike, on July 1, 1881.

After the conveyance to Leiter the tenants under the Bowen lease, including Pike, continued to pay the full rent reserved in the lease, but always under protest and claim of rebate, but no specific amount that should be rebated was mentioned, and no negotiations were had with Leiter on the subject.

On April 19, 1883, Pike desiring to secure a renewal of the lease under the terms thereof, served on Leiter a notice addressed to him and to the owners and claimants of lots one to five in B. S. Morris' subdivision aforesaid, at the southeast corner of State and Madison Streets, constituting a square piece of ground, with a frontage of 100 feet upon State Street and 100 feet on Madison Street; recites the making of the lease by A. Nisbet Turnbull to the Bowen Brothers, July 2, 1866, of said premises, describing them as in the original lease, and the provision in said lease in reference to a renewal, and the requirement therein as to notice; that Pike is the owner by purchase and agreement of said lease, and as such owner signifies his desire to take a new lease of the land aforesaid for the term of twenty years next after the expiration of the original term in the manner provided in said original lease.

On June 5, 1883, Leiter replied to said notice as follows:

"Chicago, June 5, 1883.

"Eugene S. Pike, Esq.

"*Dear Sir:*—In your notice to me, dated April 2, 1883, given by you, as assignee of the lease formerly held by James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots one, two, three, four and five, in B. S. Morris' subdivision of original lots numbered two (2) and three (3), and the north quarter (¼) of lot numbered six, in block number two, fractional section fifteen addition to Chicago, dated July 2, 1866, you state that you desire to take a new lease of the land afore-

said for a term of twenty years next after the expiration of the term granted by said lease to the Bowens.

"As you are aware, the west portion of said lots (being the west twenty-seven feet, more or less) was long since condemned by the City of Chicago for the purpose of widening State Street, and has for many years been used as a part of State Street, and can not, therefore, be included in any new lease given by me.

" If you desire to renew the lease upon that part of said lots not condemned by the city for State Street, for an additional term of twenty years from the expiration of the old lease, you will please notify me to that effect in writing before July 1st, proximo.

"Yours very truly,

"L. Z. Leiter."

To this letter Pike replied as follows:

"Chicago, June 8, 1883.

" L. Z. Leiter, Esq.

" *Dear Sir:*—Yours of the 5th just at hand, and in answer will say that in my notice to you for a new lease I followed the language of the original, that vagueness or ambiguity of expression might be avoided and every doubt of proper and sufficient notice silenced.   If it is true, as you assert, that the City of Chicago has legally condemned any portion of this property, in that case I desire a new lease of the uncondemned part.   The laws of the State make ample provision to cover such an emergency.   If, however, no part of said property has been legally condemned, the notice for a new lease is intended to cover the exact property, in its entirety, embraced in the old lease.

"Very resptly. yours,

"Eugene S. Pike."

No further communication passed between the parties on the subject of the renewal lease until April 29, 1885, when Leiter wrote Pike as follows:

" Eugene S. Pike, Esq.

" *Dear Sir:*—You are hereby notified that I have selected Van H. Higgins to act as appraiser on my part, under the pro-

vision of the lease from A. Nisbet Turnbull to James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots one to five, inclusive, in B. S. Morris' subdivision of original lots two, three, and north one quarter ($\frac{1}{4}$) of six, in block two, in fractional section fifteen addition to Chicago, dated July 2, 1866.

"LEVI Z. LEITER."

Pike replied by the following notice:

"CHICAGO, Ill., May 2, 1885.

"LEVI Z. LEITER, ESQ.

"*Dear Sir:*—You are hereby informed that I have chosen Potter Palmer, Esq., to act for me as appraiser under the provisions of the lease made by A. Nesbit Turnbull to James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots one to five, inclusive, in B. S. Morris' subdivision of original lots two, three, and north one quarter ($\frac{1}{4}$) of six, in block two, in fractional section fifteen addition to Chicago, dated July 2, 1886.

"Very truly yours,

"EUGENE S. PIKE."

Said appraisers were unable to agree upon the value of the premises, and by the following instrument they appointed Mark Skinner to be umpire:

"Whereas, on the second day of July, A. D. 1866, A. Nisbet Turnbull, of Baltimore, Maryland, as party of the first part, and James H. Bowen, George S. Bowen and Chauncey T. Bowen, as parties of the second part, of the City of Chicago, State of Illinois, executed a lease of that date for certain premises in said City of Chicago, known as lots numbered one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one quarter of six (6), in block two (2), in fractional section fifteen (15) addition to Chicago, said premises being situate on the southeast corner of State and Madison Streets, and constituting a square piece of ground, with a frontage of 100 feet on State Street and 100 feet on Madison Street.

"And whereas, in and by said lease, said lessees, James H., George S. and Chauncey T. Bowen, and their assigns, have a

right of renewal for the term of twenty years, on giving notice as required by said lease, and procuring an appraisement of the value of said lands, to fix the amount to be paid as rent on a basis of six per cent. annually upon the value of said land.

"And whereas Levi Z. Leiter has become the owner of said lands and Eugene S. Pike has become the assignee and owner of the interests of said Bowens under said lease.

"And whereas said Leiter has chosen as an appraiser to fix the value of said lands, under said lease, as such owner thereof, Van H. Higgins, to act for and represent the owner in appraising said lots and lands.

"And whereas said Pike has chosen as appraiser to fix the value of said lands under said lease as the owner of leasehold estate and of the interests of said Bowens under said lease, Potter Palmer, to act for and represent the owner of said leasehold estate in appraising said land and lots under said lease, and in pursuance of its terms.

"And whereas both of said appraisers have consented to act in the premises; and whereas, after canvassing the matters submitted to them, and trying to agree upon the valuation thereof, they have been unable to agree upon the value thereof.

"And whereas in and by the terms of said lease it is stipulated and agreed that in such case said appraisers or parties chosen to fix the value of said premises shall choose a proper person to be umpire between them.

"Now, therefore, in pursuance of the terms of said lease, and the authority thereby conferred upon the undersigned by the terms thereof, and by the owners of said land and said leasehold estate,

"We, the undersigned, do hereby appoint the Hon. Mark Skinner to be umpire between us, to decide as to the value of said lots and lands under and in pursuance of the terms of said lease.

"Witness our hands and seals this 8th day of May, A. D. 1885.

"VAN H. HIGGINS,      (Seal)
"Appraiser chosen by Leiter.
"POTTER PALMER,      (Seal)
"Appraiser for Mr. Pike."

Afterward Skinner made an award in writing in the following terms:

"Whereas, on the 2d day of July, A. D. 1866, A. Nisbet Turnbull, of Baltimore, Maryland, as party of the first part, and James H. Bowen, George S. Bowen and Chauncey T. Bowen, as parties of the second part, of the City of Chicago, State of Illinois, executed a lease of that date for certain premises in said City of Chicago known as lots numbered one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one quarter of six (6), in block numbered two (2), in fractional section fifteen (15) addition to Chicago, said premises being situate on the southeast corner of State and Madison Streets, and constituting a square piece of ground, with a frontage of one hundred (100) feet on State Street and of one hundred (100) feet on Madison Street.

"And whereas, in and by said lease, said lessees, James H. Bowen, George S. Bowen and Chauncey T. Bowen, and their assigns, have a right of renewal for the term of twenty (20) years, on giving notice as required by said lease, at a rental of six (6) per centum annually upon the value of said premises, to be determined by an appraisement in the manner prescribed in said lease; and whereas Levi Z. Leiter has become the owner of said lands, and Eugene S. Pike has become the assignee and owner of the interests of said Bowens under said lease.

"And whereas said Leiter has chosen as an appraiser to fix the value of the said lands under said lease, as such owner thereof, Van H. Higgins, to act for and represent the owner in appraising said lots and lands.

"And whereas said Pike has chosen as appraiser to fix the value of said lands under said lease, as the owner of the leasehold estate and of the interests of said Bowens under said lease, Potter Palmer, to act for and to represent the owner of said leasehold estate in appraising said lands and lots under said lease and in pursuance of its terms.

"And whereas both of the said appraisers have consented to act in the premises; and whereas, after canvassing the

matters submitted to them, and trying to agree upon the valuation thereof, they have been unable to agree upon the value thereof.

"And whereas in and by the terms of said lease it is stipulated and agreed that in such case said appraisers, or parties chosen to fix the value of said premises, shall choose a person to be umpire between them.

"And whereas the said Van H. Higgins and Potter Palmer, in pursuance of the terms of said lease, and the authority thereby conferred upon them by the terms thereof and by the owners of said land and said leasehold estate, have appointed Mark Skinner to be umpire between them to decide as to the value of said lots and lands, under and in pursuance of the terms of said lease.

"Now, therefore, I, the undersigned, Mark Skinner, having made examination into the matters submitted to me as aforesaid, and ascertaining that a portion of said premises, to wit, a strip of land twenty-seven (27) feet in width from east to west, by one hundred (100) feet in length from north to south, off the west end of said lots one (1), two (2), three (3), four (4) and five (5), is now apparently used and occupied as a part of State Street, leaving the premises now one hundred (100) feet front on State Street, by seventy-three (73) feet deep, do hereby decide the value of the same, at the day of the date hereof, to be three hundred thousand dollars.

"Dated at Chicago this 29th day of May, A. D. 1885.

"MARK SKINNER."

Thereupon negotiations were had between Pike and Leiter as to the form of the new lease. Various drafts of leases were prepared and submitted by each party to the other, and interviews were had between the parties and their respective counsel, but the parties failed to agree upon the renewal lease.

Pike claimed that the award of Skinner was a valuation of the whole hundred feet square, and insisted that Leiter should make him a lease of 100 feet square. Leiter claimed that the award was a valuation of the east seventy-three feet only, and that he had no title to more than the east seventy-three feet,

and he insisted that he could not and would not make any lease covering the west twenty-seven feet of the lots.

On June 30, 1885, Pike assigned the Bowen lease to one Raspin R. Cherry, who immediately notified Leiter of the assignment. This assignment was made by Pike so as to avoid personal liability on the covenants of the renewal lease, but no objection to the assignment was made by Leiter and negotiations for the renewal lease went on in Cherry's name, but under the direction of Pike's counsel.

Leiter in the first week in July caused to be prepared and submitted to Cherry a draft of lease describing the land as described in the Bowen lease, but as subject to the rights of the city in the twenty-seven feet strip, and having some variation in language from the Bowen lease, and fixed the rental at $18,000 per annum.

This was rejected as follows:

"CHICAGO, July 8, 1885.

" L. Z. LEITER, ESQ.

"*Dear Sir:*—I have read the last lease sent to me and can not accept it. What I desire is just such a lease as you are required to make me by the terms of the old lease; no more, no less.

" In negotiations thus far I have acted in the spirit of compromise, but I now decline to make any changes, and require that no deviation whatsoever shall be made in the language or significance of the new lease not provided for in the old one.

" Respectfully,

" RASPIN R. CHERRY,

"By ROBERT C. GIVINS, Att'y in fact.

" I concur in the above.

" EUGENE S. PIKE."

Nothing further was done between the parties till, on September 11, 1885, Leiter sent to Cherry a renewal lease signed and sealed by him (Leiter), containing a covenant to pay a rental of $18,000 per year, with provisions which are conceded to have been in all respects as required by the terms of the Bowen lease, and describing the land demised as it is described in the following letter, which accompanied the lease:

"CHICAGO, July 1, 1885.

"RASPIN R. CHERRY, ESQ.

"*Sir:*—I being advised that on the 30th day of June, 1885, you became the owner by assignment of a certain indenture of lease bearing date the 2d day of July, A. D. 1866, and recorded in the office of the Recorder of Deeds for the County of Cook and State of Illinois, on the 9th day of November, 1866, in book 364 of deeds, at page 441, made by A. Nisbet Turnbull, then of Baltimore County, in the State of Maryland, to James H. Bowen, George S. Bowen and Chauncey T. Bowen, then of the County of Cook and State of Illinois, of all those premises situate in the City of Chicago, in the County of Cook and State of Illinois, known and described as follows, to wit:

"Lots one (1), two (2), three (3), four (4) and five (5), in B. S. Morris' subdivision of original lots two (2), three (3), and the north one-quarter of lot six (6), in block two (2), in fractional section (15) addition to Chicago, and I having become on the 10th day of April A. D. 1878, the owner by assignment and conveyance from the lessor in said above mentioned lease, of said lease and of the reversion of a part of the real estate described in said lease, namely, of said lots one (1), two (2), three (3), four (4) and five (5), of B. S Morris' subdivision of original lots two (2), three (3), and the north one-quarter ($\frac{1}{4}$) of original lot six (6), all in block two (2), in fractional section fifteen (15) addition to Chicago (said Morris' subdivision being at the southeast corner of Madison and State Streets, in said City of Chicago), subject, however, to such rights as the said City of Chicago may have acquired to the west twenty-seven (27) feet of said lots one (1) to five (5), inclusive (as originally laid out), as a part of State Street, by deed, condemnation proceedings, judgment or otherwise; and the said lease containing an agreement on the part of the lessor, his heirs or assigns, to make a new lease of the premises in said original lease described, for the term of twenty years next after the expiration of the term granted by said original lease, upon compliance with certain preliminary conditions by the lessees in said original lease, their executors, administrators or as-

signs, which conditions have been complied with; and also
upon terms, the ascertainment of which is provided for in
said original lease, and which have accordingly been ascer-
tained as to that part of said land in said original lease
described, conveyed to me as above mentioned, and of which
I am now the owner by the above mentioned assignment and
conveyance, and I having no other right, title or interest in
the lands described in said original lease than that derived and
acquired, as above set forth; therefore, in performance of the
said agreement for a new lease, so far as I am or the land
owned by me is chargeable with the burden of fulfilling said
agreement for a new lease, I hereby tender to you for accept-
ance, a lease, duly executed by myself, of all those premises
situate in the City of Chicago, in the County of Cook and
State of Illinois, known and described as follows, to wit:

"Lots one (1), two (2), three (3), four (4) and five (5), in B.
S. Morris' subdivision of original lots two (2), three (3), and
the north one-quarter ($\frac{1}{4}$) of original lot six (6), all in block
two (2), in fractional section fifteen (15) addition to Chicago,
exclusive of all the buildings standing thereon (said premises
being situate on the southeast corner of State and Madison
Streets, and constituting a square piece of ground, with a
frontage of 100 feet on State Street and of 100 feet on Madi-
son Street), and subject, however, to such rights as the said
City of Chicago may have acquired to the west twenty-seven
(27) feet of said lots one (1) to five (5), inclusive (as originally
laid out), as a part of State Street, by deed, condemnation
proceedings, judgment or otherwise, for the term of years,
and containing the covenants, agreements and other provisions
contemplated by the agreement in said original lease con-
tained for a new lease.   Very respectfully yours,

"LEVI Z. LEITER."

On the receipt of the letter and lease Cherry wrote to Lei-
ter as follows:

"CHICAGO, Sept. 11, 1885.
"MR. L. Z. LEITER.

"*Sir:*—I have submitted the lease, and your communication
with reference thereto, left with me this morning, to my

attorney for his advice, but owing to his engagements I am unable to get answer to-day. I write this note to say that as soon as he gives me an opinion I will decide whether or not to accept the lease and its provisions as you have prepared them, and meanwhile you will please consider the question as in abeyance.

" Yours respectfully,

" RASPIN R. CHERRY."

To which Leiter replied:

" CHICAGO, September 12, 1885.

" RASPIN R. CHERRY, ESQ.

"*Sir:*—In reply to your communication dated yesterday, but received by me to-day, I have to advise you that having tendered to you the lease referred to by you I can not consider any question as in abeyance as you request, but I have held myself since making the tender, and I continue to hold myself, entitled to assert such rights in respect to yourself and the property described in said lease as may be given me by law in consequence of my making you the tender and of your action thereupon.

" I decline to enter into any stipulation or to have any understanding with you which will in any way modify or change the effect or result of my communication to you tendering you the lease.

" Very respectfully yours,

" L. Z. LEITER."

On September 15th, Cherry sent to Leiter a duplicate copy of the lease, duly signed and sealed by him (Cherry) and accompanied by the following letter:

" CHICAGO, September 15, 1885.

" MR. L. Z. LEITER.

"*Sir:*—In answer to your communication dated July 1, 1885, and left with me September 11, 1885, with a copy of a lease dated July 1, 1885, to which your signature is appended, I answer as follows:

" As stated in your communication, I was on the 30th day of June, 1885, the owner, by assignment, of a certain lease bearing date July 2, 1866, made by A. Nisbet Turnbull to

Pike v. Leiter.

James H. Bowen, George S. Bowen and Chauncey T. Bowen, of lots one (1), two (2), three (3), four (4), and five (5) in B. S. Morris' subdivision of original lots two (2), three (3) and the north one-quarter (N. ¼) of lot six (6), in block two (2), in fractional section fifteen (15) addition to Chicago, the same having been assigned to me by Eugene S. Pike, who was the assignee of the said James H. Bowen, George S. Bowen and Chauncey T. Bowen, and which lease was for a period of time expiring July 1, 1885, and with a provision for the extension thereof, for a term of twenty years next after the expiration of the term granted thereby, upon the lessee giving two years and six months notice in writing of the desire so to do, at an annual rental equal to six (6) per cent. upon the value of said land at the end of the term thereby granted.

" Also, as stated in your communication, said premises were conveyed to you by a deed of April 10, 1878, which was executed by Henry C. Turnbull personally, and as executor and trustee, as therein mentioned, Alexander Nisbet Turnbull and others, as heirs of the lessor, subject to such rights as the City of Chicago may have acquired to the west twenty-seven feet of said lots one (1) to nine (9), inclusive, as originally laid out, as a part of said street, by deed, condemnation. proceedings, judgment or otherwise, and also subject to said lease and its provisions, with covenants of warranty, except as to said lease and agreement, and any taxes or assessments levied or charged on said premises, or against the rights and interests of said City of Chicago or the public, which they, or either of them, now have or may hereafter acquire in said west twenty-seven feet of said lots one (1) to nine (9), both inclusive, in said Morris' subdivision.

" And I also call your attention to the fact that your grantors, by quit-claim deed dated in January, 1877, to the City of Chicago, conveyed and quit-claimed all interest in the west twenty-seven feet of sub-lots one (1) to six (6), inclusive, in B. S. Morris' subdivision of original lots two (2) and three (3), and the north one-quarter (N. ¼) of lot six (6), in block two (2), in fractional section fifteen (15) addition to the Town of

Chicago, in Cook County, Illinois, said above described premises to be used as a part of State Street, the conveyance being made for the purpose of ratifying and confirming certain condemnation proceedings theretofore instituted by the City of Chicago, under which possession of the premises had been taken by said City of Chicago, with the provision that the deed was in no way to affect the rights of any lessees of said premises, but was intended to leave the rights of all parties the same as though said city held said premises solely under said condemnation proceedings.

"And I further call your attention to the fact that the condemnation proceedings mentioned in said deed were void, and conferred no rights upon the city to the use of the west twenty-seven feet of said lots; and therefore, by the express provision of said deed, the rights of the lessees and their assignees were not affected by the proceedings to condemn or the deed to the City of Chicago.

"I further call your attention to the fact that after you received the deed from the said Turnbulls you waived any objection to the condemnation proceedings, and ratified and confirmed the same, so as to prevent you from asserting any claim or title to the said west twenty-seven feet; and for this reason it is that you are now unable, as you state in your communication, to perform the covenant in said original lease, to give a new lease covering the whole of said lots described in the original lease for the extended term therein mentioned.

"I further call your attention to the fact that the notice required by the lease of the election to take the extended term having been given on the twenty-ninth day of May, 1885, Mark Skinner, chosen as umpire by two appraisers, selected by you as owner, and Eugene S. Pike as assignee of the said Bowens, according to the provisions of said original lease, decided the value of the premises described in the original lease to be three hundred thousand dollars ($300,000), and that thereby the said Eugene S. Pike was entitled to a lease for the premises described in said original lease for the renewed or extended term, at the said appraised value of $300,000, and I succeeded to the rights of said Eugene S. Pike as his assignee.

Pike v. Leiter.

"Now, therefore, I give you notice that I accept the lease signed by you, bearing date July 1, 1885, and left with me on the morning of September 11, 1885, as a lease of a part of said lots described in the original lease, and being all of the said lots that you are able to lease to me, and furnish to me the use and possession thereof by reason of your own wrongful act in the premises; and I further give you notice that in accepting said lease I do not agree to pay the sum of eighteen thousand dollars ($18,000) per annum, being six (6) per cent. interest on the sum of $300,000, but shall claim that I am entitled to an abatement therefrom of the fair rental value of the west twenty-seven (27) feet of said lots, as described in the original lease; and I further give you notice that I do not accept the said lease as a full performance of the covenant in said original lease to grant an extended term, but only as a part performance thereof, and that you will be held liable for such damages as the law may allow for the non-performance of said covenant in full, to whoever may have a legal cause of action therefor.

"I further give you notice that I have signed the lease left with me on the morning of September 11, 1885, and had prepared a duplicate thereof, which I have signed and herewith send to you, so that you may affix your signature thereto and retain the same as a duplicate copy of said lease.

"Raspin R. Cherry."

On September 24, 1885, Leiter sent a letter to Cherry in which he notifies Cherry that he holds Cherry's communication to him, dated September 15, 1885, a rejection of the lease dated July 1, 1885, which Leiter tendered to Cherry on the 11th of September, 1885, by a communication bearing date July 1, 1885, and that Cherry's right, title and interest as a tenant in the lands and premises described in said lease, tendered to and rejected by Cherry, having expired and determined, "I hereby demand the immediate possession of the following described premises" (describing them); notifies Cherry that he is ready to pay him, as assignee of the original lease, the value of the building, and that he has appointed Jonathan Clark to value said building, and requests Cherry to

appoint a person to act with Clark for the purpose of proceed-
ing to the ascertainment of the value of said building, as pro-
vided in the lease.

On September 25, 1885, Cherry, by an instrument under his
hand and seal, transferred to Pike the renewal lease and also
the original lease with all rights and covenants in said leases
contained, and with all claims, actions and causes of action
arising out of said leases; and September 30, 1885, and on
every quarter day since that time, Pike tendered to Leiter the
amount of rent falling due as the same is reserved in the
renewal lease, but at all times under protest and claim that he
is entitled to the rebate of the fair rental value of the west
twenty-seven feet; but Leiter has at all times refused to
receive the rent so tendered, and has insisted that the lease
made by him and tendered to Cherry was not binding and
never became operative as a lease.

The premises were, in September, 1885, in the actual pos-
session of certain parties as the tenants of Pike and of Pike's
lessees, and on September 28, 1885, after having sued for
possession, Leiter commenced an action of forcible entry and
detainer against said occupants, and upon petition Pike became
a party defendant to said suit, and about the same time a suit in
ejectment was commenced by Leiter in the Superior Court of
Cook County against the same parties.

In June, 1886, Pike filed a bill, and by leave of court on
December 20th thereafter an amended bill, in which he claimed
that he was entitled as against Leiter for the overpaid rent,
and also for the amount received by Leiter from the city for
the portions taken by the city for widening State Street; that
the renewal lease by Leiter was not a full compliance with the
covenants contained in the original lease; that he was entitled
to an abatement of the rent for the fair rental value of the
twenty-seven feet; that the renewal lease executed by Leiter
was accepted by Cherry and has ever since been binding on
Leiter and is a valid lease, and that the only question left open
in said lease is as to the amount of rent complainant is to pay
for the premises therein described. But if the court should be
of opinion that said renewal lease was a performance and ful-

fillment of Leiter's obligations in respect of making a new lease and Skinner's award was a valid award, and the assignee of the original lease became liable to pay $18,000 per year as rent of the premises described in said renewal lease, then complainant offers to pay all rent accrued under sa'd renewal lease. Also asks for a construction of the Skinner award and if such award was a valuation of only the east seventy-three feet, then that it be declared void and that a valuation of the premises be made under direction of the court. Also prays for an injunction against the prosecution of the suit at law to turn Pike or his tenants out of said premises.

Leiter answered this bill and filed a cross-bill in which he included as defendants Schlesinger & Mayer and Parmly & Sweet, who were lessees of Pike, setting up the facts; insisting that Skinner's award was a valuation of the east seventy-three feet only of the lots described in the original lease; that he, Leiter, had obtained title to only that portion of said lots; that he was always ready to fulfill his obligations in respect to said renewal lease; that the lease tendered to Cherry was a complete performance of his obligations in that regard; that Cherry rejected said lease; that the only obligation remaining on Leiter was to pay the just valuation of the buildings on said land; that he was ready to do so; prayed that the renewal lease might be declared inoperative as a lease and might be ordered surrendered up to be canceled, and that it might be adjudged that Pike and the defendants who claimed under him acquired no valid interest by said instrument, and that all the rights of Pike and those claiming under him through the original Bowen lease might be declared terminated and Leiter put in possession of the premises in controversy, and that the value of the buildings be ascertained, etc. The cross-bill was answered by all the defendants thereto, Pike's lessees setting up some facts supposed to offset their respective rights, which it is unnecessary to state. On the hearing upon the pleadings and the facts above set out, the court entered a decree finding various facts, and allowing to Pike, by Leiter's consent, $2,880 as an abatement of the rent paid Pike to Leiter from the time Pike became

the owner of the Bowen lease until its expiration, for the fair rental value of the twenty-seven feet taken by the city, and adjudging that Pike is not entitled to have any other relief; that the renewal lease executed by Leiter was a full offer of performance on his part of the obligations resting on him under the Bowen lease, and was rejected by Cherry and never became operative as a lease, and that neither Cherry nor any of the defendants to the cross-bill acquired any rights thereunder, and enjoining them perpetually from setting up any rights thereunder; and that Leiter is entitled to the possession of the premises, and proceeds to settle the rights of the parties with reference to rent of the premises since the expiration of the Bowen lease and with reference to the value of buildings on the land.

From this decree an appeal is prosecuted to this court by all the defendants to the cross-bill.

Messrs. GOUDY & GREEN, for Eugene S. Pike, appellant.

Mr. H. F. VALLETTE, for Henry C. Parmly and Samuel H. Sweet, appellants.

Messrs. ISHAM, LINCOLN & BEALE and WILSON & MOORE, for Levi Z. Leiter, appellee.

MORAN, P. J. Upon the facts set out in the foregoing statement, which contains all that we deem material appearing in the record of this case, three principal questions arise :

1st. Did Leiter obtain title by the deed of conveyance made to him by Henry C. Turnbull, trustee, to anything more than the east seventy-three feet of the lots mentioned in the Bowen lease?

2d. Was the award made by Mark Skinner a valid award, and was his valuation of the east seventy-three feet of the lots, or of the whole hundred feet square described in the original lease?

3d. Was the lease tendered by Leiter to Cherry on September 11, 1885, accepted by Cherry, and is it a binding and subsisting lease?

1st. Leiter's title rested solely on the deed made to him April 10, 1878, and that described the land in question as described in the Bowen lease, but conveyed it expressly subject to such rights as the City of Chicago might have acquired to the west twenty-seven feet of said lots as a part of State Street, by deed, condemnation proceedings, judgment or otherwise. Without entering upon a discussion of the various points made by counsel for appellants as to the regularity or validity of the condemnation proceedings prosecuted by the city, or undertaking to determine what would be the condition of the title of the west twenty-seven feet of the lots in question, as affected by the condemnation proceeding alone, we are clearly of opinion that by operation of said condemnation proceeding, the possession obtained by the city, the judgment obtained by Turnbull in the United States Circuit Court for the value of the said twenty-seven feet, as assessed in the condemnation proceeding, and the delivery by Turnbull of the quit-claim deed in escrow, the city had acquired, as against Turnbull, prior to the time of the conveyance by him to Leiter, a title to the said west twenty-seven feet, and a right paramount to use and maintain the same as a part of State Street. When Leiter obtained his deed from Turnbull he was powerless to change the conditions then existing with reference to said west twenty-seven feet, and by taking the deed he assumed no obligation to do so. Nor can we see that his purchase of the judgment in the United States Court in any manner affected his relation to the title of the property. The city had, under the stipulation, the right to pay the judgment and place the quit-claim deed on record. Leiter, by becoming the assignee of the judgment, had the right to receive the money when the city was ready to pay it, but if he had refused to take the money when the city offered it, he could not thereby prevent the city from putting the deed on record.

The city, then, having acquired a title to the west twenty-seven feet of the lots prior to the conveyance by Turnbull to Leiter, it follows that Leiter obtained by his deed title to the east seventy-three feet of the lots only.

No doubt the tenants under the Bowen lease were entitled

to an abatement or rebate of the rent, to the fair rental value of the seventy-three feet taken by the city, as against Turnbull, and as against Leiter from the time he commenced taking the rent under said lease till the termination thereof.

2d. ˙ At the time Pike gave notice to Leiter of his desire to take a new lease in accordance with the provisions of the Bowen lease, both of them well knew all the facts relating to the situation of the property and the condition of the title. We think it clear that the appraisers selected by the parties were not expected by either of them to value, for the purpose of fixing a rental, the west twenty-seven feet of the lots described in the lease, which portion of said lots was, to the knowledge of all the parties, held and used as a public street, under a title obtained by the city for that purpose.

The notices given by the parties to each other of the selection of appraisers, stated that such appraisers were selected under the provisions of the Bowen lease, but it must be intended that the appraisal of the property for rental was to be of that portion only of the land described in the lease which the proposed lessor had title to, and would not include a portion in use as a street, and to which the lessor had no title. The notices and the provisions of the Bowen lease constituted the submission. The purpose of the appraisal was to fix a basis for adjusting the rent that should be paid for such portions of the land as were vested in Leiter by the Turnbull deed. It is true that the instrument signed by the appraisers appointing Skinner umpire, described the land to be appraised as the lots mentioned in the Bowen lease, but it clearly appears from the award that the umpire was not misled by such description, and that he valued only the portion of the land which it was the intention of all the parties he should value, that is, the east seventy-three feet of the lots mentioned in the Bowen lease.

We do not consider the award rendered susceptible of any other construction. The west twenty-seven feet used and occupied as a part of State Street is treated in the award as diminishing the land described, and, as it is said, "leaving the premises now one hundred feet front on said street, by

Pike v. Leiter.

seventy-three feet deep," and the value of the same is fixed at $300,000.

The submission was a valid submission, and the award is a clear and precise answer as to the value of the land, upon which, under the provisions of the Bowen lease and the rights and obligations of the parties to the submission as they existed at the time, it was competent to fix a value. The conclusion must be, therefore, that the award was valid.

3d. The yearly rental of the land to be demised by the renewal lease having been ascertained in accordance with the terms and provisions of the Bowen lease, and Pike, as assignee of said lease, having, by compliance on his part with the terms of said lease in that regard, entitled himself or his assignee to a renewal lease at the expiration of said Bowen lease, the duty of Leiter on July 1, 1885, was one of performance. The covenant to renew the lease ran with the land, and he was bound to discharge that covenant as to such portion of the reversion as he held as grantee. By agreement it was competent for Pike to have accepted as performance something less than was called for by the covenant, and so Leiter might have granted something more.

We find that there was negotiation, or perhaps it might more properly be called contention, between Leiter and Pike as to the terms of the renewal lease, and that the contention was continued after the assignment from Pike to Cherry. All efforts of the parties to agree on the draft of a lease which, in any particular, was a departure from the provisions of the Bowen lease, were terminated by the letter of Cherry, concurred in by Pike, and dated July 8, 1885.

That letter notified Leiter that strict performance was demanded of him, and thenceforth the parties dealt at arm's length. No more drafts of leases were submitted by the one to the other for approval, but Leiter, recognizing the requirements of the situation, prepared to tender full performance of his covenant. A lease was prepared by him in strict compliance with the provisions of the Bowen lease, and describing the land demised as it was described in the conveyance from Turnbull to him. This lease, signed and sealed by Leiter, he

sent to Cherry, accompanied by the letter set out in the statement of facts, in which he said: "In performance of the said agreement for a new lease, so far as I am, or the land owned by me is chargeable with the burden of fulfilling said agreement for a new lease, I hereby tender to you for acceptance a lease, duly executed by myself, of all those premises, situate in the City of Chicago," etc. It will be observed that this is a tender of the lease for acceptance as a lease. There was no condition that the lease was to be accepted as full performance of the covenant, though Leiter's position, of course, was that it was in fact and in law a full performance. As is said by the learned counsel for Leiter in their brief filed in this court, "In legal effect the simple question put by the tender of the lease was: Will you become my tenant in respect to the land described in the tendered lease at the rental named therein, and be subject in respect to that land and that rental to, the provisions of the tendered lease relating thereto?" The acceptance of the lease, then, as a lease of the land described in it, would necessarily constitute it a valid and subsisting lease between the parties to it, notwithstanding the fact that Pike, or Cherry for Pike, insisted that the lease was not a full performance of the covenants of the original lease, and that Leiter would be held for damages for non-performance of said covenants in full. The question of whether the covenant was performed was and is, under the facts of this case, an entirely different. one from the question—was the lease accepted?

The tender of the lease by Leiter constituted a delivery of it. The transfer of the instrument from Leiter to Cherry was for the purpose and with the intention on Leiter's part of vesting in Cherry the estate granted by the lease. This is manifest from his acts and from his words. He intended by what he did, to accomplish a full and final performance on his part. He did not contemplate any further acts of performance whatever. We find nothing in his conduct or his words that gives support to the contention of his counsel that the tender did not constitute a delivery, on his part, of the lease. There is no indication that he expected a communication assenting

to the terms of the lease, but returning it to him to be delivered by him to Cherry. Nothing less than a delivery or offer to deliver on his part, would be a performance of his covenant; hence his tender was a delivery or a tender of delivery, which, if accepted, would at once become a completed delivery of the instrument.

But the question still remains, was the lease accepted? The acceptance of an instrument, like the delivery of it, is a matter of intention to be gathered from the acts and words of the person to whom the instrument is offered. Now, what were Cherry's acts? After applying to Leiter to leave the question in abeyance for a day or two, and having been refused and told that Leiter stood on his tender of the lease, he signed and sealed the instrument which Leiter had delivered to him, and made a duplicate thereof, which he also signed and sealed, and delivered to Leiter to sign and seal, and retain as a duplicate copy of said lease. Now, treating the words contained in the communication accompanying the duplicate lease, that "in accepting the lease I do not agree to pay the sum of $18,000 per annum," as indicating a rejection of the lease, as counsel contend they did, and what, under the rules of law, must be our conclusion? If there were no inconsistent words, it will be admitted by all that the acts done by Cherry in signing and retaining the lease delivered to him, and sending a duplicate of it executed by himself to be signed and retained by Leiter, would be regarded as most satisfactory, if not most conclusive evidence of his intention to accept the lease. His most solemn and deliberate acts evince an acceptance; his words are said to be inconsistent therewith.

But, saith my Lord Coke, "When the words are contrary to the act which is the delivery, the words are of none effect—*non quod dictum est, sed quod factum est, inspicitur*." Co. Lit. 36 a.

And in Leake on Contracts, at page 13, it is said: "In judging of intention from a person's words and conduct, where his acts are inconsistent with his words, the former are, in general, accepted as a more reliable guide to the intention than the latter, and the conduct may, in some cases, determine the intention, even in opposition to the words."

Under this rule, which is based on sound reason, it is very clear that Cherry's conduct proves an acceptance of the lease by him, even allowing that the words of his letter to Leiter indicate a contrary intent. But we are of opinion that the words of the letter, when all read and considered, can not be understood as a rejection of the lease. He wrote: "I give you notice that I accept the lease signed by you, bearing date July 1, 1885, and left with me on the morning of September 11, 1885, as a lease of a part of said lots described in the original lease, and being all of said lots that you are able to lease to me, and furnish me the possession of, by reason of your own wrongful act in the premises."

That is a plain acceptance of the lease in words, as being a lease of part of the lots and all that Leiter was able to lease, just as Leiter himself contended. It may be that the words of the letter show a reluctant, grumbling, carping acceptance, but there is none the less a clear and unconditional acceptance.

But it is contended that the words, "I further give you notice that in accepting said lease I do not agree to pay the sum of $18,000 per annum," was a rejection of, or refusal to be bound by the chief agreement on the tenant's part, i. e., to pay the rental named in the lease; that this notice which accompanied the duplicate lease is to be construed with it, as two instruments executed at the same time as parts of the same agreement. The facts here do not permit the application of the principle invoked. The letter or notice was not an agreement between the parties contemporaneous with the lease. It was not an agreement between the parties at all, and does not purport to be. Allowing it the utmost dignity that can be ascribed to it, it was but an attempt to annul the binding effect of a sealed covenant, by parol expressions made by the covenantor contemporaneous with the delivery of the instrument containing the covenant. As such it was utterly without legal consequence or effect, and could never be introduced in evidence to defeat or modify the covenant. Cherry became bound to pay the rent reserved in the lease when he accepted, signed and sealed the lease tendered to him by Leiter, and when he had done that and had also signed and sealed a

duplicate thereof and delivered it to Leiter he created the most solemn evidence of his agreement which is known to the law; and it is a proposition of law settled beyond controversy, that parol words, whether prior, contemporaneous or subsequent, are, in the absence of fraud, impotent to alter or annul such an obligation. Chapman v. McGrew, 20 Ill. 104; Herrick v. Swartwout, 72 Ill. 340; Chitty, Con., 5 and 7.

We conclude, then, that the lease tendered by Leiter to Cherry was duly accepted by him, and that it became and is a valid and subsisting lease.

The notice of Leiter, that he held Cherry's communication a rejection of the lease tendered, was of no effect, and the rent reserved in the lease having been regularly tendered to him by Pike on each quarter day as it became due, the proceedings by Leiter to get possession of the premises were in violation of his obligations under the lease. It follows that the Superior Court erred in adjudging in the decree appealed from, that the said lease had been rejected by Cherry and was not a valid and subsisting lease binding on Leiter, and in ordering the surrender and cancellation thereof, and in granting any of the relief granted upon Leiter's cross-bill.

Pike prayed in his bill for a rebate of the rent paid by him to Leiter, and the decree allows to him a rebate to the amount of $2,880. We have examined the evidence introduced by Pike to establish the amount of rebate he should be allowed and are of opinion that the amount allowed by the court is the amount that should be allowed, and that finding of the decree will therefore be affirmed. Leiter is entitled to receive from Pike all the accrued rent from the commencement of the term under the renewal lease, and said renewal lease will be found to be a valid and subsisting lease of the premises therein described for the term therein named.

As the conclusion reached will render relief under the cross-bill of Parmly and Sweet unnecessary, the same as well as the cross-bill of Leiter, will be dismissed at Leiter's cost.

The decree of the Superior Court is reversed, save as to the allowance of said rebate of $2,880, and the case remanded to that court with directions to enter a decree in conformity with this opinion. · *Reversed and remanded.*